Filed 5/15/23  P. v. Brewer CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>ROBERT CRAIG BREWER,<br><br>      Defendant and Appellant. | F082631<br><br>(Super. Ct. No. F19902558)<br><br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

        James S. Thomson, under appointment by the Court of Appeal, and Laura Ann Douglas for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Robert Craig Brewer fired a firearm multiple times into a vehicle occupied by two adults and a two-year-old child. A bullet also entered a separate vehicle being driven in the area.

A jury found defendant guilty of three counts of willful, deliberate, and premeditated attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; counts 1-3), two counts of shooting at an occupied vehicle (§ 246; counts 4 & 5), being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 6), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 7). On counts 1 through 5, the jury also found firearm enhancements to be true (§ 12022.53, subd. (c)).[2] Defendant admitted two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Gang allegations to counts 6 and 7 were dismissed on motion by the People and, in a bifurcated trial, the jury found gang allegations to counts 1 through 5 to be not proven. The court sentenced defendant to an aggregate term of 166 years to life, as follows: On each of counts 1 through 3, the court sentenced defendant to consecutive terms of 27 years to life, plus 20 years for the firearm enhancements. The court sentenced defendant on each of counts 4 and 6 to concurrent terms of 25 years to life, and on count 5 to a consecutive term of 25 years to life. On count 7, the court imposed and stayed a six-year term. (Former § 654.)

On appeal, defendant argues (1) the trial court erred in admitting evidence from the ShotSpotter gunshot detection system under *Kelly*[3]; (2) the evidence is insufficient to

---

[1] Undesignated statutory references are to the Penal Code.

[2] The trial court later struck the firearm enhancements to counts 4 and 5 as inapplicable.

[3] "Formerly known as the *Kelly-Frye* rule, based on the rulings of *People v. Kelly* (1976) 17 Cal.3d 24 . . . (*Kelly*) and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 [*Frye*], the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8

2.

support his conviction for attempted murder on count 3 because the evidence did not establish he knew the two-year-old child was in the vehicle; (3) the prosecutor committed misconduct in arguing the jury could convict on count 3 even if defendant did not know the child was in the car; (4) the court erred in not staying his sentence on count 4 under former section 654; (5) the matter should be remanded for resentencing in light of Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567) because the court imposed an upper-term sentence on counts 1 through 3 without complying with the requirements of the amended law; (6) alternatively, if the court did not impose an upper-term sentence on counts 1 through 3, the matter nonetheless should be remanded for resentencing because the court erred under section 12022.53, subdivision (f) in imposing two firearm enhancements on each of these counts; and, finally, (7) his enhancements should be stricken on resentencing in light of Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill No. 81). Additionally, in relation to count 4, we requested supplemental briefing on the effect of Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 441) (Assembly Bill No. 518), which amended section 654 to provide trial courts discretion in choosing which sentences should be stayed pursuant to that section. In supplemental briefing, defendant contends remand is required for resentencing pursuant to Assembly Bill No. 518.

We conclude the judgment must be modified to reflect the sentence on count 4 is stayed pursuant to section 654. In all other respects, we reject defendant's contentions and affirm the judgment.

---

(*Nieves*).) Although defendant characterizes his argument as arising under *Kelly/Frye*, we will refer to this as the *Kelly* rule.

## FACTS

### I. THE SHOOTING

On January 17, 2019, at approximately 11:09 a.m., Rashad H. was driving his black Dodge Charger in the area of South Eunice and Chester Riggins Avenues in Fresno. Rashad's cousin, Anthony H., was in the front passenger seat and Rashad's two-year-old son, R.H., was in the back seat.

As Rashad drove on South Eunice, gunshots were fired into his car. Once the shooting started, Anthony jumped into the back seat and wrapped R.H. in his arms. Rashad fled on East California Avenue, where more shots were fired into his car. He eventually drove to his aunt's house on Plumas Street. Rashad did not hear the gunshots himself, but was alerted to the shooting by Anthony. He did not see who fired the shots and did not know who did the shooting. Rashad testified that he grew up in the area of the shooting and knew it to be "[s]omewhat" of a high-crime area where daily shootings occurred.[4]

At the time of the shooting, Zachary G. was driving a Mitsubishi Montero SUV on East California Avenue. He saw two Dodge Chargers "flying by." Zachary heard gunshots and heard the glass in his rear window crack. A bullet shattered his rear window before bouncing off the vehicle's visor. He identified an orange Charger and a black Charger as the cars that passed him when his window was shot out. He did not see any shooting. Zachary pulled into the parking lot of a nearby high school. An expended bullet was found on his front passenger floorboard.

---

[4] Rashad also admitted to having a 2018 conviction for conspiracy to distribute narcotics.

## II.   SHOTSPOTTER EVIDENCE

ShotSpotter, Inc. (ShotSpotter) employee P. Greene testified at trial regarding the ShotSpotter acoustic gunshot detection and location system used by the Fresno Police Department.  He provided a detailed explanation of the functioning of the ShotSpotter system, as described in greater detail below.  On the date of the shooting, ShotSpotter detected six gunshots fired within approximately two seconds of each other at 11:08 a.m. near an address in the 2200 block of South Eunice Street.  The ShotSpotter data indicated the shooter was traveling northbound at approximately 41.3 miles per hour.  Less than a minute later, the system detected a single shot at an address in the 800 block of East California Avenue, followed by 13 shots fired within approximately five seconds of each other at 11:09 a.m. near a different address in the 800 block of East California Avenue. The data indicated the shooter was driving westbound at 66.5 miles per hour.[5]

## III.   911 CALLS

A 911 caller at 11:09:46 a.m. reported that multiple shots had been fired from a black Dodge Charger that was driving down California Avenue.  The caller reported that four to 10 shots had been fired, and additional shots could be heard while the caller was on the phone.

A 911 caller at 11:10:24 a.m. reported six to eight shots fired at Martin Luther King Boulevard and California Avenue.  The caller reported that it sounded like the rounds were hitting buildings.

A 911 caller at 11:12:01 a.m. reported that two cars were shooting at each other and that the shooting started at Eunice and Martin Luther King Boulevard.  The caller

---

[5] Defense counsel cross-examined Greene using a report created by a former ShotSpotter employee, which plotted the locations of the gunshots at "significantly" different locations than those determined by Greene.  Greene did not know how the former employee determined those locations and did not know why the former employee plotted the gunshots at different locations.  Greene acknowledged that "there are many environmental factors that can affect the accuracy of the location."

reported seeing a black car in front with an orange Dodge Charger behind it, and reported that the occupants of the cars were African American. The caller reported seeing two men in the orange car and said that a person in the orange car had a .45-caliber gun. The caller said the cars went down Lorena going towards California Street.

A 911 caller at 11:21:24 a.m. reported having information regarding the shooting. She reported that the "first car" was a black Charger, and that the "second car" was a new, bright orange Mustang. She also reported that a white BMW was involved.[6] She reported seeing only one person in each vehicle. The caller did not see any shooting but saw the driver "hangin' out" or leaning out of the orange Mustang and heard shots. She reported that the drivers of each of the vehicles were African American males.

IV. **LAW ENFORCEMENT INVOLVEMENT**

Fresno Police Department Officer M. Hughes was assigned to the high school near the shooting as a school resource officer. Around the time of the shooting, she was turning onto Fresno Street, heading back to the high school after responding to an unrelated call. She saw an orange Challenger run a stop sign and proceeded to follow it. She noted defendant was the driver and sole occupant of the car. She prepared to follow the vehicle and heard over the police radio that the vehicle had been involved in a shooting, with shots fired near the school. Hughes contacted the school and put it on lockdown.

Fresno Police Department Sergeant T. Bustos was at the intersection of Fresno and C Streets when he heard the ShotSpotter alert and the citizen calls reporting that two cars were shooting at each other. A minute later, he saw the orange Dodge Challenger "travelling at a very high rate of speed," approximately 70 miles per hour, going eastbound on Fresno Street, away from the area where shots were reportedly fired.

---

[6] An officer contacted one individual at the scene of the shooting who indicated he was driving a white BMW and followed the involved vehicles.

Bustos made a U-turn in his marked, black-and-white SUV and began following the Challenger. Bustos activated his lights and sirens but the Challenger did not yield, and instead wove in and out of traffic "obviously trying to avoid" Bustos. The Challenger eventually stopped and defendant got out of the car and ran.[7]

An undercover officer also followed the orange Challenger until it stopped. The officer pursued defendant as he ran from the car and held him at gunpoint until assisting officers arrived. Defendant was apprehended with the key fob for the orange Challenger in his pocket. A health care card bearing defendant's name was found in the car.

A .45-caliber Glock semiautomatic pistol with an extended 24-round magazine was found in an empty lot a short distance from where the orange Challenger had stopped. The magazine was empty, there was no round in the chamber, and the serial numbers had been removed from the gun.

Rashad's black Charger had bullet holes in the rear of the vehicle, the right rear tire was flat, the front license plate was hanging by one bolt, plastic trim from the front bumper was hanging into the road, and there was a traffic cone stuck underneath the car.[8]

Nine .45-caliber Winchester shell casings were found over an approximately 80-foot distance on East California. The majority of the casings were in the westbound lanes, on the north side of East California. One casing was found in the eastbound lanes, on the south side of East California. Four .45-caliber Winchester shell casings were found on South Eunice Street, in an area where the ShotSpotter indicated shots had been fired. The officer who collected the casings could not specify how long the shell casings had been on the street. Another officer acknowledged there was frequent crime in the

---

[7] Bustos did not see anyone else run from the vehicle and no one else was in the vehicle when he approached it. However, on cross-examination, Bustos acknowledged the possibility that other occupants could have exited the vehicle while the vehicle was out of his sight during the pursuit.

[8] Traffic cones were laid out in front of the high school near the shooting prior to the shooting.

area where the shell casings were located, and he could not state whether the shell casings were related to this shooting.

An expended .45-caliber Winchester casing was found under the driver's seat of the orange Challenger. A live .45-caliber Winchester cartridge also was found in the vehicle. There were no bullet holes in the orange Challenger. The Challenger's front passenger seat was tilted forward.

The black Charger was struck four times in the rear of the vehicle. One round went through the left taillight and into the trunk area. One went through the rear bumper, into the left rear fender well, and then nicked the left rear tire, and went through the front fender well. Another went through the rear bumper just below the license plate. Another went through the trunk, through the rear seat, through the front passenger seat, and into the glove box. Expended bullets and bullet fragments were found under the trunk liner on the driver's side of the car, under the rear bumper, and in the driver's side rear quarter panel. A projectile for the bullet that entered the glove box was not located or recovered.

All 14 of the bullet casings that were recovered from the area of the shooting were fired from the Glock .45-caliber semiautomatic pistol that was found in the empty lot near where the orange Challenger was abandoned. The bullets and bullet fragments recovered from Rashad's and Zachary's cars were all .45 caliber. They were "most likely" fired from a Glock pistol but, due to the poor quality of the markings on them, it could not be determined that they were fired from the recovered Glock pistol. An expert testified that it is "very common" to be unable to identify bullets fired from Glock pistols due to "how the barrels are machined."

Gunshot residue was found on defendant's hands. The People's gunshot residue expert acknowledged that the test could not definitively determine whether defendant fired a gun.

The Glock .45-caliber pistol and extended magazine were tested for the presence of DNA and no meaningful data was obtained. No fingerprints were found on the gun, the magazine, or any of the spent cartridges.

A number of videos were admitted into evidence and played for the jury. The videos showed the orange Challenger driving behind the black Charger at the time of the gunshots, driving north on South Eunice, west on East Lorena Avenue, north on South Martin Luther King Boulevard, and then west on East California. Defendant then drove north on Klette Avenue while Rashad continued west on East California toward South Plumas Street.

After defendant was arrested, an officer searched the jail's recorded inmate phone call system and found a call between defendant, Rashad, and Anthony,[9] which took place approximately seven hours after the shooting. In the call, defendant apologized to Rashad.

## DISCUSSION

### I.    ADMISSION OF SHOTSPOTTER EVIDENCE

Defendant argues the ShotSpotter evidence was inadmissible under *Kelly* because the system for identifying and classifying gunshots is not generally accepted as reliable. He further argues admission of the evidence was prejudicial. We conclude the evidence was not erroneously admitted and, even if it was, any error was harmless.

#### A.    Additional Procedural and Factual Background

##### i.    Motion in Limine

The People moved in limine to introduce ShotSpotter data and information at trial. The People argued the evidence was not novel and met the *Kelly* standard for admissibility. At the hearing on motions in limine, the court indicated it was inclined to

---

[9] Anthony was arrested on the date of the incident for unrelated reasons. He was placed in the same area of the jail as defendant.

admit the evidence if a proper foundation was laid and the evidence was shown to be relevant. Defendant objected to admission of the evidence but reserved further argument until after an Evidence Code section 402 hearing.

ii.    *Evidence Code Section 402 Hearing Evidence*

At the Evidence Code section 402 hearing, Greene testified that he is a senior forensic services engineer for ShotSpotter. He explained that he had worked for ShotSpotter for over 14 years and had testified as an expert witness on the ShotSpotter system approximately 120 prior times.

Greene began by explaining how the ShotSpotter system works. He described the ShotSpotter system as an "acoustic gunshot detection system." ShotSpotter installs microphone sensors to listen for the sound of gunfire or other impulsive noises. When the microphones detect such sounds, they report the "exact time" the sound was heard to a central location server application, which calculates the geographic location where the sound originated. That data, including audio of the sound and GPS positions of an approximate location, is then reported to ShotSpotter customers, who typically are law enforcement agencies.

To describe how this process works, Greene described "how an incident works from end to end" by way of an example of "a single gunshot incident where only one round is fired." He explained that, when a firearm is discharged within the ShotSpotter coverage area, the sound of the muzzle blast, or "the bang, that comes from the weapon," travels outward in all directions at the speed of sound. As it does so, different ShotSpotter sensors detect the noise, and each sensor will "look into its internal GPS receiver and antenna and will find the exact times of millisecond and report that time," which is called the arrival time, back to the location server application. The location server application is connected via wireless networking to all the sensors in its system. When more than three sensors report hearing an impulsive noise like a gunshot, the

10.

location server application will use a "mathematic system called multilateration" to try to calculate the geographic location where the sound originated.

Greene explained that multilateration uses multiple known points, specifically the locations of each of the sensors, to identify the otherwise unknown point where the noise originated, e.g., where the weapon was fired. The system calculates the difference of the sound's arrival times between sensors, calculated against the speed of sound, to create a hyperbolic curve, which must be plotted on a graph. Typically, a map of the earth with latitude and longitude lines is used for the graph. A separate hyperbolic curve is created for the different arrival times between each of the sensors. Each resulting curve is laid on top of the others and, at some point, all the curves intersect. The system translates the latitude and longitude of that intersection through other software to obtain a street address. The street address, latitude and longitude, and the exact time of the shooting are all reported to the customer. The entire process typically takes less than 45 seconds.

ShotSpotter publishes to its customers a "limited performance guarantee," which guarantees that the ShotSpotter system "will accurately detect and locate at least 90 percent of all . . . outdoor detectable gunfire" within a 25-meter radius or 50-meter diameter. Greene explained that this is a "deliberate understatement of ShotSpotter's accuracy," and that, in practice, ShotSpotter is typically accurate to approximately 10 feet of the actual shooter. He explained that all the clocks and times used by ShotSpotter are synchronized to GPS time, which in turn is synchronized to an atomic clock at the National Institute of Standards and Technology in Boulder, Colorado. He described the clocks as "very accurate." Greene explained that the ShotSpotter location server indefinitely stores audio clips and corresponding timestamps that are created by the sensors.

Greene explained that many outside factors could affect the accuracy of the ShotSpotter's location determination. "[A]ny element in the environment" could prevent the sound of gunfire from reaching enough ShotSpotter sensors, or could change, modify,

or muffle the sound of gunfire so that the sensors do not recognize it as an impulsive sound. Examples of environmental elements that could affect the ability of ShotSpotter sensors to recognize impulsive sounds include buildings, hills, terrain, ravines, freeways, competing noises, or the manner in which the weapon is fired. Greene explained that a small-caliber weapon fired from an enclosed area or at a group could change the acoustic energy sounds and prevent the sound from traveling to a sensor or prevent the sensor from detecting the sound. However, ShotSpotter can "get around" these issues by installing 20 to 30 sensors per square mile.

ShotSpotter has many sensors installed in Fresno County over five separate systems, each covering a discrete area.

Greene explained that ShotSpotter could detect and locate gunshot incidents up to 500 yards out of the system, depending on whether it was otherwise quiet out. However, such incidents typically are not reported because the location accuracy goes down outside the boundary of the sensors. The longest distance Greene was aware of a sensor detecting and participating in an alert was approximately one and one half miles.

Greene explained that mechanisms are in place to make sure the system is working properly. Each sensor sends a status report every 60 seconds and ShotSpotter tracks all sensors that are inoperative. If a sensor is permanently or intermittently inoperative, ShotSpotter can dispatch a technician to replace the sensor.

Greene explained that gunshot incidents detected by ShotSpotter result in a "[d]etailed forensic report," which describes the information reported to the customer and analyzes the incident to determine the accuracy of the reported data. To verify the accuracy of the data reported to the customer, Greene uses a software called the ShotSpotter browser, which applies the same mathematical functions as the live ShotSpotter system, to read the pulses in the audio clips and determine the location of each individual shot. The latitude and longitude of each detected shot, along with the timestamp to the millisecond of the detected shot, is reported in the detailed forensic

report.  The report is then forwarded to the requestor, which may be prosecutors or defense attorneys.  Developing such reports and testifying to their contents represents the bulk of Greene's work.

Greene prepared a detailed forensic report in relation to the instant case, in conformity with ShotSpotter's current standards and practices, which Greene personally developed based on his background, training and experience.  Each of the ShotSpotter detections was given an individual incident identification number, also called a "flex I.D." number.  The flex I.D. numbers in defendant's case were 47743, 47744, and 47745.

On cross-examination, Greene discussed classifying and reclassifying gunshots. He explained that ShotSpotter will attempt to characterize a detection incident as either gunfire or non-gunfire.  A gunfire incident may be published as multiple gunshots, single gunshots, or possible gunshots.  A non-gunfire incident may be published as firework, backfire, construction noise, helicopters, or any number of other things.  If a customer finds physical evidence at the scene of an alert that is contrary to how ShotSpotter classified the incident, the customer may ask ShotSpotter to reclassify the incident.  Thus, a report of a gunshot may be reclassified as a non-gunshot.

Greene was not aware of any California court rejecting the ShotSpotter technology as unreliable.[10]  He was aware of one case in New York "where a ShotSpotter wasn't rejected, the verdict was thrown out."  He also was aware of a pending civil case—in which he was a defendant—that had been filed against ShotSpotter in New York.  He stated the case was still in the discovery phase and ShotSpotter had not yet had its "own day in court."

---

[10] Greene clarified that he was familiar with a case in Contra Costa County where the court initially rejected the ShotSpotter evidence under *Frye*, but the court later reversed that decision after additional evidence was presented and permitted the ShotSpotter evidence to be admitted.  Greene did not "consider that the Court rejecting the technology."

13.

On cross-examination, Greene again explained the ShotSpotter technology. He explained that, when the ShotSpotter system detects an impulsive noise, it reports the exact time of the noise to the server for computation. An audio clip of the noise is transmitted to the server in the cloud, and a link to the audio clip is provided to the customer. Greene confirmed that law enforcement is ShotSpotter's primary customer, but other customers include public utilities, college campuses, and corporate campuses. He agreed that ShotSpotter is proprietary technology. However, he explained that the base algorithms used by ShotSpotter are "very old" and are based on artillery sound ranging, which was used during World War I to locate the sound of German artillery firing across lines. He explained: "It wasn't done with computers. It was done actually with people and stop watches, you know slide rule to do all of the computation. The same algorithmic -- the same algorithms have been used throughout history. Again, you know, sound ranging in World War II, the lower end navigation, aerial navigation system, which is the precursor to GPS, was based on multilateration algorithms, the U.S. Navy and the Government employed what's called the SOSUS, S-O-S-U-S, system underseas, underwater microphones that was used to detect Soviet submarines. There are any number of uses for the algorithms. More currently, seismologists, the U.S. Geographic Survey uses the same sort of algorithms to pinpoint the epicenter of earthquakes. In fact, that particular mathematic was the inspiration for ShotSpotter in the first place."

Finally, Greene testified that he primarily testifies for the prosecution, and that he testifies for the defense 1 percent, or less than 1 percent, of the time.

On redirect examination, Greene confirmed that, despite the proprietary nature of the ShotSpotter algorithms, the basis of the technology is trigonometry and calculus.

On recross-examination, Greene confirmed that he had a high school diploma, some college, and some trade school experience. He also worked in various information technology environments before working at ShotSpotter.

14.

The court asked Greene whether and how ShotSpotter could differentiate between a gunshot and other sounds like a car backfiring. Greene explained, "ShotSpotter does its best to by itself try to differentiate and characterize that sound. We got many years of experience recording and analyzing the sounds of gunfire, but I will be the first to admit, it's not a perfect science. In fact the classification of a gunshot is the one element that we do not guarantee. But ShotSpotter will attempt to [use] audio measurements of the loudness of the sounds, the frequency of the sound, sharpness, and other environmental factors such as time of day, the temperature. It will attempt to classify or characterize that event as a type of gunfire or not gunfire. After that's done the alert is then transmitted -- before it goes to the customer, that alert is transmitted to our review center, a human is going to listen to that -- to audio of that event. . . . The reviewer's job is to try to vet out, to weed out those acoustic events or sound events. Those sounds that are absolutely not gunfire. And what that does is it leaves a -- the rest of those alerts get published to our customers directly from there, and it's a higher percentage of those published alerts will be actual gunfire."

Greene further explained this process. He explained that a reviewer receives an alert and opens the event to listen to the associated audio clips. If the reviewer believes the clips contain the sound of gunfire, they will "hit a button called published," and the information will go directly to the customer. The customer will then receive an alert at their dispatch or 911 center, and the dispatcher will listen to the audio clips. The dispatcher will also see a dot on a satellite map and information regarding the incident details, including the system it came from, how many rounds were automatically detected by the system, and whether the reviewer determined the ShotSpotter did not detect all the rounds. Greene explained that, for example, "[i]f say there were 10 rounds total fired and ShotSpotter only was able to successfully detect three, but we still recorded all ten, the reviewer can listen to that and that's a number that they can append." However, ShotSpotter does track that the number was changed, by whom, when, and why. The

15.

customer also receives the district or beat, as well as the latitude and longitude and street address of the detection, the computer-aided dispatch number that was used by the dispatchers, and the exact date and time of the occurrence.

Greene confirmed that ShotSpotter microphones, GPS technology, recording data, and processing instruments had been in existence for a long time. He also confirmed that ShotSpotter was being used by 117 law enforcement agencies throughout the country, including Fresno, Bakersfield, Salinas, San Francisco, Oakland, Richmond, San Pablo, Sacramento and San Diego, as well as in Florida; Massachusetts; Chicago; St. Louis; Kansas City; Houston, Texas; Columbus, Ohio; Cleveland; and Cincinnati. Greene confirmed he was not aware of any cases other than the one he had mentioned in which the ShotSpotter technology or processes were deemed unreliable or unscientific.

On recross-examination, Greene confirmed that a human being is involved in the classification process but "all they are doing is changing the labeling at most, possibly round count at most." He further confirmed that all the information, whether published to the customer or dismissed, is saved indefinitely. He explained, "There are many cases where a customer comes back to us and asks to reclassify an incident to make it visible to them because they found ballistic evidence at that scene. They went, they investigated, they found something different than what we decided and we obliged them, obliged the customers by changing the classification based on the evidence. But there is a human in the loop, and they do have the ability to change that labeling."

### iii.    Evidence Code Section 402 Argument and Ruling

Defendant primarily argued the ShotSpotter evidence was unreliable because a human being listened to the sound recorded by the system and categorized it as gunshots. He also argued Greene was not qualified to testify about the system.

The court noted the recorded audio clips were retained indefinitely, and a defense expert could testify to the mischaracterization of any sounds, if necessary. The court explained, "To me the witness gave a pretty adept recitation and understanding of the

16.

technology involved. I don't think an expert witness has to have an advance degree to assist jurors. You said the issue is human factor. I don't think that human factor is necessarily a [*Kelly*] issue. The technology and equipment have been used and established for a long time without issue." With regard to the "human factor," the court noted the technology was more probative than a human calling 911 and reporting hearing gunshots. The prosecutor pointed out that defendant could explore the reliability of the classification process on cross-examination. The court stated, "I would expect the evidence at a minimum would come in that the sounds that are recorded at this time, at this location, are consistent with gunshot." The court further noted the defense could call an expert to testify that the sounds reflected in the audio clips were not gunshots, and that argument in that regard would go to the weight of the evidence, rather than its admissibility. Accordingly, the court found the evidence admissible under the *Kelly* standard.

*iv.    Trial Evidence and Argument*

ShotSpotter evidence was admitted at trial. Greene's testimony at trial regarding the functionality of the ShotSpotter system was substantially similar to his testimony at the Evidence Code section 402 hearing. He explained that ShotSpotter is an acoustic gunshot detection and location system that involves microphone sensors that listen for impulsive noises such as a "bang, boom, or pop." The noises and the exact time of their detection are reported back to the central location server software application. That application then attempts to calculate the geographic location of where the noise originated. The resulting information is reported to a human reviewer who listens to an audio clip of the event and either dismisses the alert as "not gunfire" or publishes the incident to the customer's 911 center. The published information includes the date and time of the incident, the latitude and longitude of the incident, and a street address.

Greene explained that ShotSpotter sensors detect the sound of gunfire as it travels outward at the speed of sound. Different sensors detect the sound at different times as the

17.

sound travels from one spot to another. When a microphone detects a gunshot, an internal GPS receiver notes the time the sound was detected to the millisecond. This is called the arrival time. The sensor, arrival time, and audio measurements are reported to the central location server, which uses a mathematical technique called multilateration to calculate the geographic location of the sound. Using differential calculus and the difference in arrival times between sensors, the location server will calculate points on a graph that create a hyperbolic curve. The hyperbolic curve is laid flat on a map of the earth with latitude and longitude lines. This is repeated for multiple sensors, creating multiple hyperbolic curves, which are laid on top of one another. The point where all the curves intersect indicates the latitude and longitude where the sound originated.

The location server then attempts to characterize or classify the event as either single gunshot, multiple gunshot, probable gunshot, or non-gunshot. Non-gunshots may include fireworks, backfires, construction noise, helicopters, or other impulsive noises. Once the system classifies the incident, it is transmitted to a ShotSpotter employee reviewer who listens to audio clips of the event to determine whether or not the event involves gunfire. The reviewers "are there to weed out the incidents that are definitely not gunfire." The reviewer can then publish the incident to the customer's 911 center or dismiss the incident. Additionally, Greene explained that the incident reviewer can add notes to the incident, or can change "the number of rounds or . . . impulsive noises or bangs that they heard." They can also change the "labeling of that incident," for example from fireworks to gunfire, or vice versa. However, a reviewer cannot change the date, time, or location of the incident, and cannot change the audio clips themselves. The review typically takes an average of 45 seconds.

Greene stated that the ShotSpotter system is "pretty well dead on accurate" as it relates to the time of an event. As far as location, ShotSpotter guarantees that it will accurately detect and locate at least 90 percent of outdoor detectable gunfire within a 25-

18.

meter radius. However, in Greene's experience, ShotSpotter can typically estimate the location of a gunshot incident to within 10 feet.

ShotSpotter also makes information that it collects available to customers in different forms, including a detailed forensic report. Greene creates these reports by reviewing the available audio clips and verifying that the information initially reported to the customer is correct. Greene created a detailed forensic report in relation to the instant case on April 11, 2019. In doing so, he reviewed three different "Flex I.D. Number[s]," which he described as unique incident identification numbers given to every incident. As explained above, the first incident consisted of six shots fired in rapid succession within approximately two seconds of each other at 11:08 a.m. near a particular address in the 2200 block of South Eunice Street. The ShotSpotter data indicated the shooter was traveling northbound at approximately 41.3 miles per hour. Less than a minute later, the system detected a single shot near a particular address in the 800 block of East California, followed by 13 shots fired in rapid succession within approximately five seconds of each other at 11:09 a.m. near a different address in the 800 block of East California. The data indicated the shooter was driving westbound at 66.5 miles per hour.

The prosecutor referred to the ShotSpotter data in closing argument. First, the prosecutor stated, that, on the date of the incident, at "around 11[:00] a.m.," the ShotSpotter "alert goes off at Eunice Avenue." The prosecutor then played a portion of the ShotSpotter audio and discussed other evidence regarding the shooting, including video evidence, before playing additional audio from ShotSpotter of shots being fired on California Street. The prosecutor stated, "You hear 13 rounds being fired. [An officer] recovers nine of those rounds." After discussing additional evidence, the prosecutor explained how the evidence related to the offenses. In discussing counts 1 and 2, the prosecutor explained that defendant had taken a direct, but ineffectual step in attempting to murder the victims: "We have 21 of those [steps]. Nine of them were found at California, four of them were found at Eunice, one of them was found in [defendant's]

19.

car, and the other ones you can hear on the ShotSpotter, the intent to kill."[11]  The prosecutor then played ShotSpotter audio of what he argued constituted six gunshots on Eunice Street and 13 gunshots on California.  The prosecutor also argued that the firing of six rounds on Eunice Street and 13 rounds on California, as well as the fact that the firearm was loaded with 21 rounds of ammunition, constituted evidence of premeditation and deliberation.  The prosecutor reiterated that 21 rounds were fired, and again played the ShotSpotter audio.  With regard to count 3, the prosecutor argued that the firing of 21 rounds constituted evidence to support a conviction for attempted murder under the kill zone theory.  Finally, the prosecutor again played ShotSpotter audio in relation to his argument regarding the firearm enhancements.  The prosecutor reiterated that the firearm held 21 rounds, and that defendant shot it 21 times.

Defense counsel did not address the ShotSpotter evidence in closing, and the prosecutor did not address the ShotSpotter evidence in rebuttal.

The court revisited the issue of ShotSpotter evidence at sentencing, in order to supplement the record with regard to a then-recently issued case, *People v. Hardy* (Feb. 24, 2021, A158179).[12]  The court reiterated its determination that the ShotSpotter evidence was admissible under the *Kelly* standard.  However, even if the evidence was admitted in error, the court noted it was "merely corroborative to the overwhelming direct and circumstantial evidence pointing towards [defendant's] guilt.  That evidence including videos of [defendant] racing around southwest Fresno chasing the victim vehicle, [defendant's] flight from law enforcement both in the vehicle and on foot, the indicia found in the suspect vehicle linking [defendant] to the firearm located in the path

---

[11] It is unclear how the prosecutor determined 21 rounds were fired.  Greene testified to ShotSpotter detecting 20 gunshots:  six at Eunice, one on California, followed by 13 more on California.

[12] The court subsequently granted rehearing in *People v. Hardy*, A158179, and later issued a substantively similar opinion in *People v. Hardy* (2021) 65 Cal.App.5th 312.

of [defendant's] flight, the ballistics evidence tying the gun to the shell casings in the suspect vehicle as well as at the shooting scenes, the [gunshot residue] evidence on [defendant's] hands, the 911 calls -- just to give a few examples -- that if a motion for new trial had been brought to me it would be denied without any [ShotSpotter] evidence and still be in this Court's opinion overwhelming."

## B. Applicable Law

"Under the *Kelly* rule, ' "when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial.' [Citation.] *Kelly* 'renders inadmissible evidence derived from a "new scientific technique" unless the proponent shows that (1) "the technique is generally accepted as reliable in the relevant scientific community"; (2) "the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "the person performing the test in the particular case used correct scientific procedures." ' " (*Nieves*, *supra*, 11 Cal.5th at p. 444.)

"Not every subject of expert testimony needs to satisfy the *Kelly* test. Courts determining whether *Kelly* applies must consider, first, whether the technique at issue is novel, because *Kelly* ' "only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." ' [Citation.] Second, courts should consider whether the technique is one whose reliability would be difficult for laypersons to evaluate. A '*Kelly* hearing may be warranted when "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." ' [Citation.] Conversely, no *Kelly* hearing is needed when '[j]urors are capable of understanding and evaluating' the reliability of expert testimony based in whole or in part on the novel technique." (*People v. Peterson* (2020) 10 Cal.5th 409, 444 (*Peterson*).)

"Because *Kelly* is applicable only to ' "new scientific techniques" ' [citation], courts must make 'the threshold determination of whether to conduct a *Kelly* hearing in the first instance.' " (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 782–783.) "Appellate courts review de novo the determination that a technique is subject to *Kelly*." (*People v. Jackson* (2016) 1 Cal.5th 269, 316; see *Nieves*, *supra*, 11 Cal.5th at p. 444.) We also review de novo "the trial court's evaluation regarding whether a new scientific technique is generally accepted as reliable in the relevant scientific community." (*Nieves*, at p. 444.)

### C.    Analysis

At the outset, we note that defendant does not challenge the entirety of the ShotSpotter technology, but rather challenges only the reliability of ShotSpotter's technique for identifying and classifying sounds as gunshots.[13]

We are skeptical that this aspect of the ShotSpotter system requires *Kelly* review. Although the record does not contain significant detail regarding the process or technique the ShotSpotter system uses for identifying whether or not a sound is a gunshot, Greene explained that the process uses "the loudness of the sounds, the frequency of the sound, sharpness, and other environmental factors" to make this determination.[14]  When the

---

[13] Defendant also seemingly suggests ShotSpotter is unreliable in its ability to determine the location where such sounds originated.  However, he does not state this argument under a separate heading or subheading.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  His failure to do so forfeits this claim on appeal.  (*Herrera v. Doctors Medial Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 547.)  Regardless, defendant clarifies in his reply brief that, because the location calculations are dependent on ShotSpotter accurately identifying sounds as gunshots (a process which he claims is itself unreliable), the resulting calculations also are unreliable.  In other words, this is merely a restatement of his original argument, that ShotSpotter cannot reliably identify and classify sounds as gunshots or non-gunshots.

[14] Another court considering the admissibility of ShotSpotter evidence has explained:  "The digital signal processors of the sensors measure sound input to determine if the sound meets 28 different audio characteristics of 'impulsive audio pulses,' or a 'bang, boom, or pop,' and could thus be categorized as a possible

ShotSpotter system detects gunshots, the audio clips are reviewed by a human reviewer before an alert is sent to the customer. Even after a human reviewer classifies a sound as gunshots, that determination may be revised at the request of the customer based on information found in the field. Greene explained that this aspect of the technology is "not a perfect science" and is the "one element" of the ShotSpotter technology that the company does not guarantee.

This testimony does not suggest that the ShotSpotter process for classifying gunshots is based on a novel method of scientific proof. (*Nieves*, *supra*, 11 Cal.5th at p. 444.) In particular, the ultimate determination regarding whether to send a gunshot alert to a customer is made by a ShotSpotter employee whose only training in this regard involves listening to audio clips of verified gunshots and accurately discerning gunshots from non-gunshots with 80 percent accuracy. This human process of listening to sounds and determining that they sound like gunshots is not a scientific technique, let alone a novel one. Indeed, both expert and lay witnesses regularly testify regarding the sounds of gunshots. (See, e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 671; *People v. Harris* (1989) 47 Cal.3d 1047, 1063; *People v. Mathews* (2018) 21 Cal.App.5th 130, 133; see also *People v. Bell* (2019) 7 Cal.5th 70, 104 [admission of audio recording of gunshots from crime scene surveillance video]; Evid. Code, § 720, subd. (a).) We note that, in the

gunshot." (*State v. Hill* (2014) 288 Neb. 767, 775 (*Hill*).) "If the sound meets the preprogrammed criteria for a possible gunshot," it is transmitted to the central location server for review by a human reviewer, who rules out a false positive. (*Ibid.*) That court found the ShotSpotter system was sufficiently reliable under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*) and corresponding state case law, and the evidence therefore could be presented to the jury. (*Hill*, at pp. 792-794.) We acknowledge that our Supreme Court has declined to adopt the *Daubert* standard, under which widespread acceptance of a scientific technique is not required for admissibility. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. 7 (*Daveggio and Michaud*).)

instant case, audio of 911 calls by eyewitnesses who reported hearing gunshots was admitted without defense objection.

Based on the foregoing, the process for characterizing sounds as gunshots does not purport to " ' "provide some definitive truth which the expert need only accurately recognize and relay to the jury." ' " (*Peterson*, *supra*, 10 Cal.5th at p. 444.) Furthermore, Greene readily acknowledged the fallibility of the system, thereby dispelling any " ' "misleading aura of certainty" ' " regarding this process. (*Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 832.) In light of these circumstances, we do not believe jurors would be incapable of understanding and evaluating the reliability of this process for classifying sounds as gunshots or non-gunshots. (See *Peterson*, at p. 444.) Accordingly, we conclude Greene's testimony regarding the characterization of particular sounds as gunshots was not required to satisfy the *Kelly* test before it could be admitted.

Regardless, even if we assume this aspect of the ShotSpotter technology is subject to *Kelly* review, we need not determine whether it meets the *Kelly* requirement of being "generally accepted as reliable in the relevant scientific community." (*Nieves*, *supra*, 11 Cal.5th at p. 444.) This is because any conceivable error in admitting ShotSpotter evidence regarding the classification of sounds as gunshots was harmless.[15] *Kelly* is the state law standard for admissibility of scientific evidence. (See *Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 831, fn. 7.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional . . . test" under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Our Supreme Court has

---

[15] Because we do not consider whether the ShotSpotter evidence satisfied the *Kelly* test for admissibility, we deny defendant's request for judicial notice of materials he claims address the question of whether ShotSpotter has gained general acceptance in the scientific community. (See *People v. Young* (2005) 34 Cal.4th 1149, 1171, fn. 3 [judicial notice cannot be taken of any matter that is irrelevant]; see also *People v. Sanders* (2003) 31 Cal.4th 318, 323, fn. 1 [declining to take judicial notice of documents that were not before the trial court].)

confirmed that *Kelly* error is subject to *Watson* review for harmlessness, which focuses on what the jury was likely to have done in the absence of the error under consideration.[16] (*People v. Schultz* (2020) 10 Cal.5th 623, 661; *People v. Venegas* (1998) 18 Cal.4th 47, 93.)

Here, the significance of the ShotSpotter evidence was that defendant fired numerous times at the vehicle containing Rashad, Anthony, and R.H., thereby indicating his intent to kill the victims. Evidence of this fact was overwhelming, even without the ShotSpotter evidence. Four bullets struck Rashad's vehicle and one struck Zachary's vehicle. A 911 caller reported hearing up to 10 rounds fired, and additional rounds could be heard over the course of the call. A total of 14 shell casings were found at the various scenes of the offenses, all of which were fired from the firearm found in a field near the site where defendant abandoned the vehicle. Thus, the evidence overwhelmingly established that defendant fired at least 14 rounds at the victims.

---

[16] Defendant argues the admission of this evidence also violated his federal due process rights, and thus is subject to review under the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.) Thus, to prove a deprivation of federal due process rights, defendant must satisfy a high constitutional standard. " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230.) Defendant has not shown that the admission of the ShotSpotter evidence rendered his trial fundamentally unfair, particularly given that federal law does not require proof that a scientific technique is generally accepted as reliable in the relevant scientific community before such evidence may be admitted. (See *Daubert*, *supra*, 509 U.S. at pp. 588–589.)

Greene testified that ShotSpotter detected 20 gunshots at the times and locations relevant to the offenses. The prosecutor argued in closing argument that ShotSpotter detected 21 gunshots, and argued this volume of gunshots was indicative of defendant's intent to kill. We recognize that the prosecutor repeatedly referred to the 21 gunshots during closing argument. However, evidence that defendant fired upon the victims at least 14 times is no less indicative of his intent to kill. Thus, even if erroneous, admission of the ShotSpotter evidence was undoubtedly harmless under the *Watson* standard, as there is no reasonable likelihood the jury would have entered a different verdict absent this evidence.

In sum, the court did not err in admitting ShotSpotter evidence and, alternatively, any error in the admission of this evidence was harmless.

## II.   SUBSTANTIAL EVIDENCE OF INTENT TO KILL R.H.

Defendant argues the evidence is insufficient to prove that he attempted to kill R.H. because the evidence did not show that defendant knew R.H. was in the zone of harm, which he contends is required to find him guilty of attempted murder under a "kill zone" theory. We disagree.

### A.   Additional Background

The trial court instructed the jury with regard to the kill zone theory as follows:

"A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or 'kill zone.' A 'Kill Zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

"In order to convict the Defendant of the attempted murder of [R.H.] the People must prove that the defendant not only intended to kill Rashad [H.] or Anthony [H.], or both, but also intended to kill everyone within the kill zone in order to kill Rashad [H.] or Anthony [H.], or both.

"In order to find the defendant guilty of Count 3, Attempted Murder of [R.H.], the People must prove that:

"1. The only reasonable conclusion from Defendant's use of lethal force is that he intended to create a kill zone;

"2. Defendant intended to kill Rashad [H.], or Anthony [H.], or both,

"3. Defendant harbored the intent to kill everyone within the kill zone in order to make sure he killed Rashad [H.], or Anthony [H.], or both, AND

"4. [R.H.] was inside the kill zone.

"In determining whether the Defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all the circumstances including, but not limited to the following:

"• The type of weapon used

"• The number of shots fired

"• The distance between the Defendant, Rashad [H.], Anthony [H.], and [R.H.].

"If you have reasonable doubt whether the defendant intended to kill [R.H.] by killing everyone in the kill zone, or you have reasonable doubt whether the defendant intended to kill Rashad [H.] and Anthony [H.], then you must find the Defendant not guilty of the attempted murder of [R.H.].

"You may only use the Kill Zone theory as it relates to the Attempted Murder of [R.H.], as alleged in Count 3. Do not use the Kill Zone theory for any other purpose."

The prosecutor argued the kill zone theory as follows:

"Count 3, the Dodge Charger had a back window tint. Two-year old child. Well, how do we know [defendant] knew that that two-year old child was in the car. The windows won't roll down enough to see that two-year old child. Two-year old's [*sic*] are small. How do we find for attempted murder on [R.H.]? This is a theory of a law called Kill Zone. It basically stands for the proposition that if you take a firearm and you are trying to kill somebody, in trying to kill that person you were trying to eliminate everybody around him in order to effectuate that murder, you are guilty of murder for those people in the Kill Zone.

"So you have to prove that the only reasonable conclusion of the [d]efendant's lethal force was to create a Kill Zone.

27.

"Here you got 21 rounds being fired at a moving vehicle. The [d]efendant intended to kill Rashad [H.] or Anthony [H.], or both. The reason it's an or, you got a Dodge Charger, you are firing 21 rounds at either one of those individuals. If [R.H.] is in that zone of danger, clearly [defendant] is trying to kill everybody in that vehicle in order to effectuate the murder of Rashad [H.] or Anthony [H.], or both. The People's position he was trying to kill both Rashad [H.] and Anthony [H.]. We know that because the car was in movement, so we know he was trying to kill the driver of that vehicle. We know he knew that the passenger was in that vehicle because both windows were rolled down. And lastly, you have to prove that [R.H.] was within the Kill Zone. We get that from Rashad [H.]'s testimony that Anthony [H.] was in the car. We get that from the shoes that were within that vehicle. You get that by the fact that . . . Anthony [H.] is not wounded or fatally wounded. 'Cause remember Anthony [H.] was in that passenger seat. He hears people shooting. If there is not a two-year old in that backseat Anthony [H.] doesn't get out of his passenger seat and cover up that two-year old. That's how we know . . . [R.H.] was in that vehicle. When you are using this Kill Zone theory, it's slightly complicated. It's not just, Oh, I fired a bullet at a group of people so I intended to kill everybody in that zone. You got a zone of danger with eight people in it and you fire three rounds you are not intending to kill everybody in that zone of danger, but on the flip side you got a small area. You got three people and you fired 21 rounds. That's seven .45 caliber bullets for each passenger in that vehicle.

"The type of weapon that was used. Did [defendant] use a standard Glock? Yeah. Did he use a standard magazine? No. [Defendant] had an extended magazine capable of holding 24 rounds, and we know that he fired 21 of those at the vehicle, six of them on Eunice, 13 of them on California. So [defendant] in driving that orange Challenger and firing at that Dodge Charger created a zone of danger.

"One thing that happened, it's kind of a legal and possibility, [*sic*] if the jury says, you know what, I don't think he was trying to kill Rashad [H.] or Anthony [H.]. But man, that two-year old, he was trying to kill that two-year old. And you use a Kill Zone theory to get there, you can't do that because the Kill Zone theory has to have a primary target. That primary target being Rashad [H.], Anthony [H.], or both. All of that's to say at the end of this I'm going to be asking for a guilty verdict on Counts 1, 2 and 3. But if for some reason you don't find guilty on Counts 1 and 2, you can't find guilty on Count 3."

28.

## B. Applicable Law

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

However, in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*) our Supreme Court recognized that "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 745–746 (*Smith*) [summarizing the holding of *Bland*, at pp. 329–330].) The "kill zone" theory applies only where the trier of fact concludes "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

"In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance

between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. . . . [T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

## C. Analysis

Defendant does not dispute that the evidence was sufficient to establish he intended to create a zone of fatal harm and R.H. was located within that zone of harm. However, he argues the kill zone theory may only be applied to individuals the defendant *knew* were within the zone of harm, and the evidence did not support a finding that he knew R.H. was in Rashad's car. He therefore argues his conviction for the attempted murder of R.H. must be reversed.

This court rejected a similar argument in *People v. Adams* (2008) 169 Cal.App.4th 1009 (*Adams*). There, the defendant was convicted of the premeditated murder of one victim by means of arson, and the premeditated attempted murders of three others who were at the site of the arson fire. (*Id.* at p. 1012.) The defendant argued her convictions for premeditated attempted murder should be vacated because she did not know the three other individuals were present. (*Ibid.*) This court disagreed, explaining:

> "[T]he concurrent intent doctrine permits a rational jury to infer the required express malice from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. The concurrent intent theory recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person or persons. The theory imposes attempted murder liability where

30.

the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die. Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm" (*Id.* at p. 1023.)

We therefore rejected the defendant's argument that the attempted murder convictions should be vacated because the defendant was not aware of the presence of other persons at the arson site. (*Ibid.*)

*Adams* is dispositive of defendant's challenge to his conviction for the attempted murder of R.H. Nonetheless, defendant argues *Adams* was wrongly decided, has been implicitly rejected by our Supreme Court in *Canizales*, and should not be followed. Defendant first urges us to depart from *Adams* because the high court has "never endorsed" the kill zone theory "in a case in which the defendant was unaware of the presence of additional victims." This argument is unconvincing. *Adams* has constituted established precedent on this point since 2008, and our Supreme Court has never held to the contrary.

Defendant points out that one aspect of *Adams* was criticized in *People v. Medina* (2019) 33 Cal.App.5th 146, 155 (*Medina*). In *Medina*, the court articulated the kill zone theory as follows: "In addition to a primary target, there must be evidence of a specific intent to kill everyone in the kill zone surrounding the primary target—not some or most, but everyone." (*Ibid*.) The court then noted that some courts, including this court in *Adams*, had "held it sufficient to give a kill zone instruction if a defendant recognizes (or accepts the fact) that a natural and probable consequence of his or her act toward the primary target would be that anyone (as opposed to everyone) within the zone of harm could or would die." (*Ibid*.) The *Medina* court disagreed with this view on the ground it "replaces the specific intent/express malice required for an attempted murder conviction with conscious disregard for life/implied malice, which *Bland* makes clear cannot support

an attempted murder conviction." (*Ibid.*)  This reasoning in *Medina* was later endorsed by the high court in *Canizales*.  (*Canizales*, *supra*, 7 Cal.5th at p. 607 [citing with approval to *Medina* for the proposition that "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk' "].)

*Canizales* therefore abrogated *Adams*, only to the extent *Adams* suggested the kill zone theory applies where the defendant "intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons . . . *with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die*."  (*Adams*, *supra*, 169 Cal.App.4th at p. 1023, italics added; see *Canizales*, *supra*, 7 Cal.5th at p. 607; see also *Medina*, *supra*, 33 Cal.App.5th at p. 155.)  Rather, under *Canizales*, the defendant must act *with the intent to kill everyone* within the kill zone before he or she may be convicted of attempted murder under a kill zone theory.  However, neither *Medina* nor *Canizales* suggests that the defendant must know of the presence of specific additional individuals within the kill zone in order to sustain a conviction for attempted murder.  Defendant concedes as much.

Defendant also contends our Supreme Court has suggested the kill zone theory "does not apply unless the defendant knows that another victim beyond the primary target is located in the zone of harm."  For support, he relies on *Smith*, *supra*, 37 Cal.4th 733, in which the defendant fired a single shot into a vehicle containing both the intended victim and her baby.  The defendant challenged his conviction for attempted murder of the baby for lack of substantial evidence he harbored the requisite intent to kill the child.  The Court of Appeal affirmed, finding substantial evidence to support the jury's verdict finding the defendant intended to kill both victims, despite only firing a single shot.  (*Id.* at p. 736.)  Notably, the jury in *Smith* was not provided a kill zone instruction.  (*Id.* at p. 746.)  Nonetheless, the Court of Appeal addressed and rejected the defendant's reliance on *Bland* as follows:

"[The d]efendant misreads this court's decision in *Bland*. *Bland*'s 'kill zone' theory does not preclude a conclusion that [the] defendant's act of firing a single bullet at [the mother] and her baby, both of whom were in his direct line of fire, can support two convictions of attempted murder under the totality of the circumstances shown by the evidence. *Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also *all others he knew were in the zone of fatal harm*. [Citation.] As we explained in *Bland*, 'This concurrent intent [i.e., "kill zone"] theory is not a legal doctrine requiring special jury instructions . . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' " (*Smith*, at pp. 745746, italics added.)

Defendant relies on the high court's passing reference in *Smith* to "all others [the defendant] *knew* were in the zone of fatal harm," to argue our Supreme Court has held the kill zone theory applies only to those individuals that the defendant knows are within the zone of harm. (*Smith*, *supra*, 37 Cal.4th at p. 746, italics added.) We reiterate that the jury in *Smith* was not instructed on the kill zone theory, and the high court determined *Bland* was not controlling. (*Ibid.*) "It is axiomatic that an opinion does not stand for a proposition the court did not consider." (*People v. Taylor* (2010) 48 Cal.4th 574, 626.) Thus, *Smith* does not support defendant's argument.

Defendant additionally suggests the high court in *Canizales* gave the kill zone theory a "narrow scope" and "expressed doubt about the broad use of kill zone instructions." The high court in *Canizales* expressed the need to "more clearly defin[e] the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 606.) After providing clarity on this point, the court stated that its "formulation of the kill zone theory" would "guard[]

33.

against the potential misapplication of the theory." (*Id.* at p. 607.) *Canizales* did not otherwise cast doubt on the kill zone theory.[17]

Finally, in his reply brief, defendant argues for the first time that the trial court erred in giving the kill zone instruction under the *Canizales* standard because the instruction was inapplicable to the facts. "[A]rguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 197.) Regardless we are unpersuaded by this argument, which once again suggests that a defendant cannot intend to kill an individual he does not specifically know is within the kill zone.

In sum, substantial evidence supports defendant's conviction for the attempted murder of R.H.

## III. PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed misconduct in arguing that the jury could convict defendant of the attempted murder of R.H. under a kill zone theory, despite defendant not knowing R.H. was in the car.

In general, "[i]t is prosecutorial misconduct to misstate the law." (*People v. Fayed* (2020) 9 Cal.5th 147, 204.) However, we have rejected defendant's argument that he could not be convicted of the attempted murder of a victim he did not know was in the kill zone. For the same reason, we reject his argument that the prosecutor misstated the law in arguing this theory to the jury.

---

**17** We note that defendant's trial took place after *Canizales* was decided, and defendant does not argue the jury instructions were inadequate under *Canizales*.

## IV.   THE SENTENCE ON COUNT 4 SHOULD HAVE BEEN STAYED

Defendant and the People agree the sentence on count 4 should have been stayed pursuant to former section 654.  We agree.

Counts 1 through 3 charged defendant with the attempted murder of the three occupants of Rashad's car.  Count 4 charged defendant with shooting at Rashad's car.  The trial court sentenced defendant on counts 1 through 3 to consecutive terms of 27 years to life, plus 20 years.  On count 4, the trial court sentenced defendant to a concurrent term of 25 years to life.

At the time defendant was sentenced, section 654 provided, in relevant part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."[18]  (Former § 654, subd. (a).)  This provision bars multiple punishment when a defendant is convicted of two or more offenses committed as a result of a single act, or resulting from a single course of conduct with a single criminal objective.[19]  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa*, *supra*, 54 Cal.4th at p. 341.)

The parties agree that count 4 arose from the same course of conduct and involved the same intent and objective as counts 1 through 3, i.e., shooting at Rashad's vehicle with the intent to kill.  Accordingly, the court should have imposed and stayed the sentence on count 4 pursuant to former section 654.

---

[18] Section 654 since has been amended.  We discuss this amendment in greater detail below.

[19] However, the so-called "multiple victim exception" permits multiple sentences for crimes of violence against multiple victims.  (*People v. Correa* (2012) 54 Cal.4th 331, 341.)  Accordingly, the parties agree the court could properly impose unstayed sentences on each of counts 1 through 3, with each count pertaining to a different victim.

The parties disagree as to the appropriate remedy.  We discuss the appropriate remedy below.

## V.    APPLICATION OF SECTION 654

Defendant argues we should remand for resentencing in light of the trial court's failure to stay the sentence on count 4.  The People argue we should stay the sentence on count 4 in the first instance.  In light of this disagreement, we requested supplemental briefing on the effect of Assembly Bill No. 518 (Stats. 2021, ch. 441), which amended section 654 to provide the court with discretion to choose to stay the longer term or terms and punish the defendant under a count carrying a lower sentence.  In supplemental briefing, defendant argues he is entitled to remand for the court to apply Assembly Bill No. 518, both with regard to whether to stay count 1, 2, or 3, instead of count 4, and with regard to whether to stay count 6, instead of count 7.[20]  The People contend remand is not appropriate because the court clearly indicated it would not have exercised its discretion to stay the sentence on counts 1, 2, 3, or 6.

As stated above, at the time of sentencing, section 654 provided:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, former subd. (a).)  Assembly Bill No. 518 amended section 654 effective January 1, 2022, to provide, in relevant part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than

---

[20] The court sentenced defendant on count 6 to a concurrent term of 25 years to life, and on count 7 to the upper term of three years, doubled because of a prior strike, and stayed pursuant to former section 654.  Defendant erroneously contends the sentence on count 7 was the middle term, because the court characterized this as the "base term." However, a three-year term is the upper term for the offense of unlawful possession of ammunition.  (See § 1170, subd. (h)(1).)

one provision." (§ 654, subd. (a).)  Thus, a trial court is no longer required to punish a defendant under the offense providing for the longest possible sentence and instead may punish a defendant under any one of the applicable offenses.  Assembly Bill No. 518 "provides the trial court new discretion to impose a lower sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)  The People concede Assembly Bill No. 518 applies retroactively to defendant's case.  (See *People v. Mani*, at p. 379; *In re Estrada* (1965) 63 Cal.2d 740, 744–746.)

However, the People contend remand is not required for the court to apply Assembly Bill No. 518 because the record clearly indicates the court would not have stayed the sentence on counts 1, 2, 3, or 6.  " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.  [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'  [Citation.]  In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Here, the court was unaware of the sentencing discretion that later would be afforded to it, and we may affirm only if the record clearly indicates the court would have imposed the same sentence, even if it was aware it had such discretion.  We conclude the record clearly indicates the trial court would have imposed the same sentence.  In sentencing defendant, the court stated the following:

> "What I see and heard was [defendant] in the middle of the day driving like a bat out of hell through southwest Fresno shooting a gun with an extended clip that was in excess of 20 rounds shooting at a vehicle that was occupied not only by two young adult men but also a two-year-old. . . . But for the grace of God [Anthony] jumped out of the passenger seat to

37.

cover up that two-year-old and coincidentally and fortuitously one of the rounds that [defendant] shot went directly through the middle of that passenger seat. And but for [Anthony] trying to protect that two-year-old, we might be here on a homicide case, not an attempted homicide case.

"This was in the middle of the day. [Zachary] going about his affairs in the middle of the day driving to run some errands when . . . his vehicle was shot and once again but for the grace of God he's not a homicide victim.

"So [defendant] may have good qualities -- and I don't doubt that -- but his conduct on this occasion as well on prior occasions puts people's lives at risk -- robbery, assault with a firearm, and now three counts of attempted murder just for starters. It's dangerous. He's a danger to our community. I don't think anyone except maybe family members would disagree with that statement."

The court then denied defendant's *Romero*[21] motion to strike his prior strike offenses, stating:

"[T]he Court finds no reason, let alone a compelling reason, to strike those strikes. They're all crimes of violence. They're not strikes like a residential burglary which may have some suggestion of potential violence but not actual violence. These crimes all are violent and they are of increasing seriousness. Attempted murder. If any bullets fired were just one or two inches off and we have a homicide case. Once again, the middle of the day, in the m[i]ddle of our community, [defendant] made the decision to do this just as he did on his prior crimes. He made a choice. He had a wife. He had a kid, but he chose to target his enemies, perceived or otherwise, and try to take their lives. That was a decision he made as unfortunate as it was."

The court also denied probation as an "absurd consideration" and proceeded to sentence defendant as previously stated. The court noted: "The numbers are huge. I don't deny that. But they are also warranted and I am convinced of that."

The foregoing statements clearly indicate the court viewed defendant's current offenses and criminal history as serious and his conduct as dangerous to the community, necessitating a lengthy prison sentence. While the law in effect at the time of sentencing

---

[21] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

-- specifically, the Three Strikes law and the former version of section 654 – substantially curtailed the court's sentencing discretion, the court nonetheless exercised its limited discretion to impose a greater sentence than that recommended by the probation department. Specifically, although the probation department recommended concurrent sentencing on counts 4, 5, and 6, the court exercised its discretion to sentence defendant on count 5 to a consecutive term. This discretionary choice, along with the court's statements at sentencing, clearly indicate an intent to impose the maximum possible sentence.[22] (Cf. *People v. McVey* (2018) 24 Cal.App.5th 405, 418–419; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.)

Because the record clearly indicates the trial court would have imposed the same sentence even if it were aware of the discretion it later would be afforded under Assembly Bill No. 518, remand for resentencing is not required. Accordingly, we will remand with directions to modify the judgment to reflect that sentence on count 4 is stayed pursuant to section 654.

## VI.    SENATE BILL NO. 567

Defendant argues he is entitled to remand for resentencing pursuant to Senate Bill No. 567 because the trial court imposed an aggravated term of nine years for attempted murder on counts 1, 2, and 3, tripled pursuant to the Three Strikes law, without satisfying the requirements of the law as amended by Senate Bill No. 567.[23] The People contend

---

[22] It appears the court may have viewed concurrent sentencing on counts 4 and 6 as mandatory. The probation department recommended concurrent sentencing on these counts because "the crimes were committed so close in time and place as to indicate a single period of aberrant behavior." The People acknowledged the court could properly sentence defendant to concurrent terms on counts 4 and 6 because these counts "ar[o]se from the same set of operative facts" as counts 1 through 3, but asked that a consecutive sentence be imposed on count 5.

[23] As previously stated, the court also imposed an upper-term sentence on count 7, which was stayed pursuant to section 654. Defendant has not argued this count is subject to resentencing under Senate Bill No. 567. Regardless, defendant's admission of two prior strike convictions for robbery and assault with a firearm at least partially supports

39.

Senate Bill No. 567 does not apply because the court did not calculate defendant's base term using an aggravated term of nine years for attempted murder, but rather imposed the applicable term of seven years to life for willful, deliberate, and premeditated attempted murder, plus 20 years for the applicable firearm enhancement, pursuant to the Three Strikes law. Defendant agrees that, if the sentence was calculated as the People contend, Senate Bill No. 567 does not apply. However, he contends that, under those circumstances, the court erroneously applied the firearm enhancement twice – once to add 20 years to his base term, and again to add 20 years on top of the base term for the same enhancement. We conclude Senate Bill No. 567 does not apply to counts 1 through 3, and the court properly calculated defendant's sentence on these counts.

## A. Applicability of Senate Bill No. 567

Section 1170, subdivision (b) governs imposition of a judgment of imprisonment when a statute specifies three possible terms. Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b), to provide: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, subd. (b)(1).) Subdivision (b)(2) in turn provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a

---

one of the aggravating factors listed in the probation report, that defendant's "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." We have no doubt that a jury would find this aggravating circumstance true beyond a reasonable doubt, and there is no reasonable probability the trial court would have imposed any other sentence, even if the other aggravating circumstances listed in the probation report were not proved to their respective standards. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 409–410, review granted Oct. 12, 2022, S275655.)

reasonable doubt at trial by the jury or by the judge in a court trial. . . ." Subdivision (b)(3) creates an exception to this requirement: "Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."

Here, defendant was convicted on each of counts 1 through 3 of willful, deliberate, and premeditated attempted murder. The punishment for this offense is life with the possibility of parole. (§ 664, subd. (a).) Pursuant to section 3046, defendant is subject to a minimum parole eligibility period of seven years. (§ 3046, subd. (a)(1).) Additionally, because of defendant' two prior strike convictions, he is subject to sentencing as provided for in section 667, subdivision (e).[24] Pursuant to that subdivision, the court was required to sentence defendant to an indeterminate term, and to calculate the minimum term of the indeterminate sentence as the greatest of the following options: (1) three times the term otherwise provided as punishment for the current felony, (2) imprisonment in the state prison for 25 years, or (3) "[t]he term determined by the court pursuant to [s]ection 1170 for the underlying conviction, including any enhancement . . . ." (§ 667, subd. (e)(2)(A).) In defendant's case, the third option required the court to impose a 27-year minimum term: seven years for the underlying conviction, and 20 years for the firearm enhancement pursuant to section 12022.53, subdivision (c). In addition to this, section 667, subdivision (e) required the court to impose this minimum term "in addition to any other enhancement or punishment provisions that apply." Thus, in addition to the minimum term of 27 years to life, the court was required to impose a 20-year term for the firearm enhancement pursuant to section 12022.53, subdivision (c).

---

[24] The same provisions are set out in section 1170.12, subdivision (c)(2). For ease of reference we cite only to section 667.

Based on the foregoing, it is apparent the court did not sentence defendant on counts 1 through 3 pursuant to a statute that specifies three possible terms. (See § 1170, subd. (b).) As defendant concedes, Senate Bill No. 567 does not apply in this circumstance.

**B.    Application of the Section 12022.53 Sentencing Enhancement**

Defendant maintains that the foregoing composition of his sentence is erroneous because the court may not use the section 12022.53, subdivision (c) firearm enhancement both to increase his minimum term by 20 years under the Three Strikes law, and to enhance his sentence by an additional 20 years as required under section 12022.53, subdivision (c) itself. Rather, he contends that, if the court used the firearm enhancement to increase his minimum term by 20 years, the court was required to impose and stay the additional section 12022.53, subdivision (c) enhancement on each of counts 1 through 3. Defendant is incorrect.

As explained above, section 667, subdivision (e) governs the imposition of defendant's sentence. Subdivision (e)(2)(A) provides the method for calculating the minimum term of the indeterminate sentence and, as already explained, required the trial court to set the minimum indeterminate term at 27 years to life. (§ 667, subd. (e)(2)(A)(iii).) In addition, section 667, subdivision (e) provides that this indeterminate term is "in addition to any other enhancement or punishment provisions that apply." Additionally, the indeterminate term was required to be served "consecutive to any other term of imprisonment for which a consecutive term may be imposed by law." (§ 667, subd. (e)(2)(B).) Thus, section 667 expressly envisions that the court will both impose the section 12022.53, subdivision (c) enhancement of 20 years, and utilize the section 12022.53, subdivision (c) enhancement in calculating the minimum indeterminate term. (*People v. Flores* (2021) 63 Cal.App.5th 368, 380.)

Defendant's reliance on section 12022.53, subdivision (f) is misplaced. Section 12022.53, subdivision (f) states: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment." Thus, where more than one section 12022.53 enhancement is found true, a trial court must punish the defendant pursuant to the section 12022.53 enhancement with the longest term, and must impose and stay any remaining section 12022.53 enhancements. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130.) Here, the trial court did not impose sentence on multiple section 12022.53 enhancements, and subdivision (f) of that section does not apply.

In sum, Senate Bill No. 567 does not apply to counts 1 through 3, and the trial court did not err in sentencing defendant on each of these counts to an indeterminate term of 27 years to life, plus 20 years.

## VII.   SENATE BILL NO. 81

Defendant contends his enhancements should be stricken on resentencing in light of Senate Bill No. 81. Senate Bill No. 81 made various amendments to section 1385. These amendments "shall apply to all sentencings occurring after January 1, 2022." (§ 1385, subd. (c)(7).) As the parties agree, Senate Bill No. 81 does not apply to defendant's April 8, 2021 sentencing and thus does not provide independent grounds for vacatur of defendant's sentence. Although Senate Bill No. 81 would apply to any resentencing proceedings, we have concluded defendant is not entitled to resentencing on any other grounds.

Accordingly, defendant is not entitled to resentencing pursuant to Senate Bill No. 81.

## DISPOSITION

The matter is remanded for the court to modify the judgment to reflect that sentence on count 4 is stayed pursuant to section 654. The court shall also correct the

abstract of judgment to reflect the correct case number, F19902558.  Upon doing so, the court shall forward the amended abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.


                                                                              DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SMITH, J.

44.